UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
LBF TRAVEL, INC.,                                        :

                    Plaintiff,            :

      v.                                              :

FAREPORTAL, INC. et al.,

                             :

                Defendants.          :
-------------------------------------------------------------x

13 Civ. 9143 (LAK) (GWG)

REPORT AND
RECOMMENDATION

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      Plaintiff LBF Travel, Inc. ("LBF") has brought this action alleging that Fareportal, Inc.

and WK Travel, Inc. (collectively "defendants") infringed upon its trademarks and trade dress

and engaged in other deceptive business practices.  Defendants now move to dismiss the first

amended complaint pursuant to Rules 12(b)(1), 12(b)(6), and 13(a) of the Federal Rules of Civil

Procedure.  For the following reasons, this motion should be granted in part and denied in part.

I.      BACKGROUND

     A.     Facts Alleged in the Complaint

      For purposes of deciding defendants' motion to dismiss, the Court assumes the

allegations in LBF's amended complaint are true and draws all reasonable inferences in LBF's

favor.  See, e.g., Steginsky v. Xcelera Inc., 741 F.3d 365, 368 (2d Cir. 2014).

         1.     LBF's Business Practices and Trademarks

      LBF is an online discount travel services business that owns and operates travel brands

"Smartfares" and "Travelation," which offer discount travel products to online customers

through the websites "www.smartfares.com" and "www.travelation.com."  See First Amended

Complaint, filed Mar. 7, 2014 (Docket # 13) ("Compl."), ¶¶ 2, 17.  LBF has owned and operated

www.smartfares.com since at least 2010, and on November 21, 2013, LBF filed an application to register "Smartfares" with the United States Patent and Trademark Office.  Id. ¶ 18.  The Smartfares trademark application is currently pending.  Id.  LBF has owned and operated www.travelation.com since at least 2010 and has owned a federally registered trademark for "Travelation" since 2008.  Id. ¶ 19.  For several years, LBF has continuously used the Smartfares and Travelation brands to provide customers with air travel bookings, hotel reservations, and booking services for car rentals, packages, and insurance.  Id. ¶ 20.

The Smartfares and Travelation brands "have come to be associated in the minds of consumers throughout the country with [LBF's] services, and the use of [these] Marks . . . substantially increases the marketability of travel, reservation, and booking services rendered by [LBF] through its www.smartfares.com and www.travelation.com websites."  Id. ¶ 23.  Also, "[t]hrough great expense and care, [LBF] has become well known and famous in its market and has acquired a reputation for excellence and outstanding service to customers . . . [and thus] [LBF's] reputation, and the goodwill associated with LBF's Marks are very valuable business assets, which [LBF] vigorously protects."  Id. ¶ 18.  Because of this fame,"potential customers will search specifically for LBF's Marks through a variety of Internet search engines, including Google."  Id. ¶ 23.

2. <u>Defendants' Business Practices and Trademarks</u>

Defendants Fareportal and WK Travel are competitors with LBF that operate travel websites offering discounted airfare, accommodations, car rentals, and vacation packages to online customers.  See id. ¶¶ 3, 25, 37-39.  Fareportal and WK Travel are affiliated with each other and have common ownership.  Id. ¶ 3.  Defendants' websites include www.cheapoair.com, www.onetravel.com, www.cheapostay.com, www.insanelycheapflights.com, and

www.farebuzz.com.  Id. ¶¶ 3, 25, 37-39.  Defendants own the following federally registered trademarks: "CHEAPOAIR," "CheapOstay," "CHEAPOAIR.COM THE ONLY WAY TO GO!!," "CHEAPOAIR.COM THE ONLY WAY TO GO!! (stylized mark)."  Id. ¶¶ 26, 43-45. Additionally, defendants have pending applications for the following trademarks: "CHEAPOAIR.COM," "www.cheapOair.com," and "ONETRAVEL."  Id. ¶ 40.  American Travel Solutions, LLC, a non-party that holds trademarks similar to the ones defendants seek to have registered, has initiated opposition proceedings against defendants' applications for the "CHEAPOAIR.COM" and "www.cheapOair.com" trademarks.  See id. ¶¶ 46-51.

3.     Defendants' Improper Use of Search Engine Marketing Programs

LBF alleges that defendants have "improperly infringed upon and diluted [LBF's] trademarks by purchasing [LBF's] trademarks as keywords from Google and other search engines (activity known as 'search engine marketing' or 'SEM'), so that when an internet user searches for 'Travelation' or 'smartfares' on Google or another search engine, an advertisement hyperlink for one of the websites of [defendants] . . . will appear on the first page of the search results."  Id. ¶ 6.

Google operates a program called "AdWords" which allows advertisers to bid on advertising hyperlinks, also known as "sponsored links," that appear on an Internet user's search results page when the user has inputted certain keywords into Google's search engine.  See id. ¶ 65.  The sponsored link contains both an advertisement for the advertiser's business and a direct link that takes the Internet user directly to the advertiser's website when the user clicks on it.  Id.  According to LBF, "[the] 'sponsored links' do not always clearly identify themselves as advertisements, and Google's layout of the ads does not conspicuously identify them as such." Id. ¶ 66.  In particular, "[the] ads at the top of the search results are designed by Google to look

3

like part of the 'non-sponsored' search results, and by virtue of the fact that they appear at the top of the list of Search Results, Internet users may infer that they are the most relevant websites on the Search Results page."  Id.  Other search engines, such as Yahoo! and Bing, offer similar SEM programs that typically "award the first sponsored result to the [advertiser] that has placed the highest bid on the keyword, i.e. the [advertiser] that has agreed to pay to the search engine operator the highest amount each time an independent internet user takes a particular action (such as searching a term or clicking on a link in the advertisement)."  Id. ¶ 67.

LBF has bid on its own trademarks with Google AdWords and other SEM services so that whenever an Internet user searches the keywords "Smartfares" or "Travelation," LBF's sponsored links appear above or to the right of the search results, thus allowing the user to go directly to LBF's websites by clicking on the sponsored links.  See id. ¶ 68.  However, defendants have also bid on the Smartfares and Travelation keywords with Google AdWords so that defendants' sponsored links also appear on the results page when a user searches for these terms.  Id. ¶ 69.  According to LBF, defendants have "purchase[d] advertising using LBF's Marks as Keywords for the specific purpose of intercepting consumers and customers of [LBF] and those who are specifically looking for TRAVELATION and SMARTFARES and diverting them to" defendants' competing websites.  Id. ¶ 70.  In support of this assertion, LBF has included in its amended complaint screen images of Google searches demonstrating that defendants' "www.cheapoair.com" website has been listed as a sponsored link for the "smartfares" and "travelation.com" keywords.  See id. ¶¶ 77-78.

LBF alleges that "Defendants' use of the LBF's Marks via search engine advertising programs causes confusion in the marketplace that Defendants' goods and services are affiliated with or otherwise approved or 'sponsored' by [LBF]; causes LBF's Marks to be diluted by

losing their distinctive quality of being associated solely with [LBF]; allows Defendants to financially benefit from and to trade off of the goodwill and reputation of [LBF] without incurring an expense similar to that incurred by [LBF] in building up its brand name; and causes [LBF] to lose, in part, control over the commercial use of its own name and LBF's Marks by placing such control in the hands of Defendants." Id. ¶ 72.

With regard to the potential confusion caused by defendants' practices, LBF contends, "[w]hen an Internet user searching on a search engine for LBF's Marks is presented with a search results page which contains multiple sponsored links, one of which may be for [LBF's] websites, and others for Defendants' competing websites . . . [the user] may click on one of the sponsored links for Defendants' websites, believing that it is related to, or sponsored by [LBF]." Id. ¶ 73.  Furthermore, "[e]ven if the Internet user realizes that the website they have been taken to is not [LBF's] website, a percentage of such Internet users may either stay at the Defendant's [sic] websites, or may otherwise discontinue their search for LBF's Marks."  Id. Additionally, "[a]n Internet user may associate the quality of goods and services offered on Defendant's [sic] website with those offered by [LBF], and if dissatisfied with such goods or services, may discontinue their search for such services entirely."  Id.

### 4.    Defendants' Allegedly Infringing Websites

LBF additionally alleges that defendants have "intentionally heightened the likelihood of confusion among consumers as to the affiliation, sponsorship, or source of the services provided by imitating the graphic user interface of [LBF's] websites, in order to mimic the 'look and feel' of [LBF's] websites."  Id. ¶ 83.  LBF asserts that it "has established distinctive, nonfunctional design elements for its websites, which consumers have come to associate with [LBF's] services."  Id. ¶ 84.  LBF explains that "[t]he layout of [its] websites appears not as a static

presentation, but rather as a series of overlapping layers aimed at accomplishing specific

tasks . . . [and] [t]he graphic design of the pages of [LBF's] websites, the 'look', is tied to the

'interface design,' comprised of dynamic navigation elements, such as hyperlinks, boxes,

buttons, menus."  Id.

      Specifically, LBF contends that its Smartfares.com website has a distinctive "look and

feel," including the following design elements: "the search engine in the upper left hand corner;

with tabs for flights, cars, hotels, vacations, and cruises immediately above the search engine;

promotional deals just to the right of the search engine; three columns listing cheap flights below

the search engine; 'Promo Codes' juxtaposed beside the cheap flights columns; and customer

service number in large, orange letter at the top of the homepage."  Id. ¶ 90.  Additionally, the

browser page for Smartfares.com displays as a title "Cheap Flights, Cheap Airline Tickets,

Cheap Flights Airfare, Flights Airfare Deals – Smartfares."  Id.  LBF alleges that defendants'

website OneTravel.com has "blatantly imitated" many of these elements in that it "also features

the search engine in the upper left hand corner; with tabs for flights, cars, hotels, and vacations

immediately above the search engine; promotional deals just to the right of the search engine;

three columns listing cheap flights below the search engine; 'Promo Codes' juxtaposed beside

the cheap flights columns; [ ]customer service number in large, orange letter at the top of the

homepage [;] . . . [and] the browser page displays a title 'Cheap Tickets, Cheap Flights &

Discount Airfare – OneTravel."  Id. ¶ 91.  LBF has attached as exhibits to its complaint

screenshot images of the home pages of Smartfares.com and OneTravel.com on December 10,

2013, to demonstrate the design similarities of these websites.  See id. ¶¶ 90-91; Smartfares.com

Homepage Image (annexed as Ex. K to Compl.); OneTravel.com Homepage Image (annexed as

Ex. L to Compl.).  Similarly, LBF asserts that the search screen for its Travelation.com website,

which "features a bar with moving stripes, the TRAVELATION mark in the upper part of the screen, and a message indicating that the website is searching for the best fares for the user's selected criteria," Compl. ¶ 92; Travelation.com Search Screen (annexed as Ex. M to Compl.), has been copied in the search screen of defendants' OneTravel.com website, see Compl. ¶ 93; OneTravel.com Search Screen (annexed as Ex. N to Compl.).

LBF alleges that it has "received several complaints from Internet users, who have been confused and mislead [sic] by Defendants' advertising practices and design of Defendants' websites into believing that they were visiting [LBF's] websites," Compl. ¶ 94, and that it has "suffered real damage to its business standing and reputation . . . by being associated with Defendants' businesses . . . in light of the extremely negative reviews that Defendants' websites [have] received," id. ¶ 95. LBF further contends that defendants' brands have a negative reputation because defendants regularly "advertise misleading savings and discounts that do not offer actual savings to consumers" and engage in other deceptive practices. Id. ¶ 109; see also id. ¶¶ 103-08. In support of these assertions, LBF has provided screenshots of negative reviews of defendants' website cheapoair.com, see id. ¶ 95, as well as an online Better Business Bureau report discussing "a range of complaints with the BBB against CheapOAir.com," id. ¶ 97.

B.    Procedural History

On December 27, 2013, LBF filed the instant suit against Fareportal and WK Travel. See Complaint, filed Dec. 27, 2013 (Docket # 1). After defendants moved to dismiss, LBF filed the amended complaint in which it asserts the following claims against defendants:

> (a) trademark infringement, unfair competition, and false designation of origin under 15 U.S.C. §§ 1051 et seq. (the Lanham Act); (b) trademark infringement and unfair competition in violation of New York State common law; (c) trademark dilution and injury to business reputation under New York. General Business Law ("NY GBL") § 360-1; (d) trade name infringement under NY GBL

§ 133; (e) unfair and deceptive trade practices under NY GBL § 349; (f) false advertising under NY GBL., § 350; (g) unfair business practice under New York State common law; (h) unjust enrichment under New York State common law; and (i) for cancellation of Defendants' U.S. Trademark Registrations.

Compl. ¶ 1; see also id. ¶¶ 110-94.  On April 25, 2014, defendants filed a second motion to dismiss.[1]

## II.   LAW GOVERNING MOTIONS TO DISMISS

A party may move to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) where the opposing party's pleading "fail[s] to state a claim upon which relief can be granted."  While a court must accept as true all of the allegations contained in a complaint, that principle does not apply to legal conclusions.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.") (citation, internal quotation marks, and brackets omitted).  In other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," Iqbal, 556 U.S. at 678, and thus, a court's first task is to disregard any conclusory statements in a complaint, id. at 679.

Next, a court must determine if a complaint contains "sufficient factual matter" which, if

---

[1] See Notice of Defendants' Motion to Dismiss Plaintiff's First Amended Complaint, filed Apr. 25, 2014 (Docket # 15); Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's First Amended Complaint, filed Apr. 25, 2014 (Docket # 16) ("Def. Mem."); Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiff's First Amended Complaint, filed May 12, 2014 (Docket # 17) ("Pl. Mem."); Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss Plaintiff's First Amended Complaint, filed May 22, 2014 (Docket # 18) ("Def. Reply").  Defendants' memorandum supporting the instant motion has incorporated by reference some arguments defendants raised in their first motion to dismiss, and thus, we cite occasionally to the memorandum in support of that motion as well. See Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Complaint, filed Feb. 21, 2014 (Docket # 11) ("Orig. Def. Mem.").

accepted as true, states a claim that is "plausible on its face."  Id. at 678 (citation and internal

quotation marks omitted); accord Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117,

121 (2d Cir. 2007) ("[A] complaint must allege facts that are not merely consistent with the

conclusion that the defendant violated the law, but which actively and plausibly suggest that

conclusion.").  "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged.  The plausibility standard is not akin to a probability requirement, but it asks for more

than a sheer possibility that a defendant has acted unlawfully."  Iqbal, 556 U.S. at 678 (citations

and internal quotation marks omitted).  "[W]here the well-pleaded facts do not permit the court

to infer more than the mere possibility of misconduct," a complaint is insufficient under Fed. R.

Civ. P. 8(a) because it has merely "alleged" but not "'show[n]' – 'that the pleader is entitled to

relief.'"  Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

Because a motion to dismiss must be decided based on the allegations of the complaint or

on documents that are attached to the complaint, incorporated in it by reference, or that are

otherwise integral to the allegations, see Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007), we

have ignored defendants' citation to non-record evidence, see, e.g., Def. Reply at 5 (discussing

the contents of websites not cited in the complaint).

III.    DISCUSSION

A.    Federal Trademark Infringement Claims

LBF alleges in Count I of its amended complaint that defendants are liable for trademark

infringement under Section 32 of the Lanham Act, 15 U.S.C. § 1114, for "purchasing LBF's

Marks as advertising keywords as means of advertising and selling Defendants' goods and

services."  Compl. ¶ 111.  Similarly, in Count II, LBF contends that defendants are liable under

9

Section 43 of the Lanham Act, 15 U.S.C. § 1125, because their "purchase of LBF's Marks as advertising keywords . . . falsely suggests that they are associated with [LBF]." Id. ¶ 125.

"Section 32(1)(a) of the Lanham Act prohibits any person from 'us[ing] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.'" Kelly Brown v. Winfrey, 717 F.3d 295, 304 (2d Cir. 2013) (quoting 15 U.S.C. § 1114(1)(a)). "Section 43(a) of the Lanham Act prohibits a person from using 'any word, term, name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion . . . as to the origin, sponsorship, or approval of his or her goods.'" Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 114 (2d Cir. 2006) (quoting 15 U.S.C. § 1125(a)).  As recently explained by the Second Circuit, courts employ the following two-step framework in analyzing trademark infringement claims:

> "First, we look to see whether plaintiff's mark merits protection." Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 115 (2d Cir. 2006).  In order for a trademark to be protectable, the mark must be "distinctive" and not "generic." Genesee Brewing Co. v. Stroh Brewing Co., 124 F.3d 137, 143 (2d Cir. 1997).  A mark is said to be "inherently" distinctive if "[its] intrinsic nature serves to identify a particular source." Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) . . . .
>
> Second, if (and only if) the plaintiff's trademark is "distinctive" within the meaning of trademark law and is therefore valid and protectable, we must then determine "whether [the] defendant's use of a similar mark is likely to cause consumer confusion." Louis Vuitton Malletier, 454 F.3d at 115 . . . .

Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc., 696 F.3d 206, 216-17 (2d Cir. 2012) (footnotes omitted); accord Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d 93, 102 (2d Cir. 2010) (same); see also The Sports Auth., Inc. v. Prime Hospitality Corp., 89 F.3d 955, 960 (2d

Cir. 1996) ("To succeed on its Lanham Act claims, [plaintiff] must show that it has a valid mark that is entitled to protection under the Lanham Act and that [defendant's] actions are likely to cause confusion with [plaintiff's] mark.") (citing 15 U.S.C. §§ 1114(1), 1125(a)(1)(A)).

Defendants argue that LBF's allegations that defendants "purchas[ed] internet search keywords through the Google AdWords program and similar programs at Yahoo! and Bing . . . do not suffice to state a valid cause of action for trademark infringement."  Def. Mem. at 2; see also Orig. Def. Mem. at 3-5; Def. Reply at 3-4.  Specifically, they argue that "[t]he mere purchase of trademarked keywords alone without something more does not constitute use of a trademark in commerce or support a claim of likely confusion."  Def. Reply at 2.  As defendants have pointed out, LBF has not alleged that defendants include LBF's trademarks in the text of their advertisements generated through the SEM programs.  See id. at 1-2.  Rather, LBF asserts that defendants unlawfully "use" LBF's trademarks when advertisements for defendants' products or websites are generated as a result of defendants having bid on LBF's trademarks through the SEM programs and that the prominent placements of defendants' advertisements, which directly results from their bids on LBF's trademarks, misleads and causes confusion among consumers using the search engines.  See Compl. ¶¶ 68-71.

Defendants' argument requires us to interpret what it means to "use" a mark in commerce.  Under 15 U.S.C. § 1127, "a mark shall be deemed to be use[d] in commerce . . . when it is used or displayed in the sale or advertising of services and the services are rendered in commerce . . . ."  In Rescuecom Corp. v. Google Inc., 562 F.3d 123 (2d Cir. 2009), the Second Circuit directly addressed the question of whether Google "used" other companies' trademarks when it marketed and sold keywords for those trademarks through the Google AdWords program.  Rescuecom held that Google had "use[d] in commerce" the trademarks

11

because Google "displays, offers, and sells [the plaintiff's] mark to Google's advertising customers when selling its advertising services . . . [and] encourages the purchase of [the plaintiff's] mark through its Keyword Suggestion Tool."  562 F.3d at 129.  While Google argued that its inclusion of the trademark in what amounted to "an internal computer directory" at Google could not constitute trademark "use," Rescuecom rejected this argument.  Id.  The court noted that "Google's recommendation and sale [of plaintiff's trademark] to its advertising customers are not internal uses."  Id.  It explained that, if it were to adopt Google's argument that "an alleged infringer's use of a trademark in an internal software program insulates the alleged infringer from a charge of infringement," this would then allow "the operators of search engines . . . to use trademarks in ways designed to deceive and cause consumer confusion" which would be "neither within the intention nor the letter of the Lanham Act."  Id. at 130.

Defendants seek to distinguish Rescuecom, contending that while Google's marketing and sale of trademarks as keywords may satisfy the "use" requirement, an advertiser's act of buying the keywords from Google does not.  Defendants argue that "[a]bsent some additional customer-facing 'use' of the trademark so as to give rise to the potential for confusion, there can be no trademark infringement claim."  Def. Reply at 3.  We do not see a meaningful difference, however, between a search engine's act of selling to an advertiser a service derived from the use of a trademark (which Rescuecom unequivocally found to be "use" under trademark law) and the advertiser's action in purchasing that benefit.  Both have "used" the trademark in the same way: by engaging in a commercial transaction — the search engine as the seller and the advertiser as the purchaser — to produce a display of search result advertisements that derives from the use of a trademark.  The notion that there must be some "additional customer-facing 'use'" of the trademark finds no support in Rescuecom inasmuch as there was no such additional "customer-

12

facing" use there either.

Indeed, since <u>Rescuecom</u> was decided, multiple courts have found the "use in commerce"
requirement to be met in the exact scenario presented in our case.  For example, in <u>CJ Prods.</u>
<u>LLC v. Snuggly Plushez LLC</u>, 809 F. Supp. 2d 127 (E.D.N.Y. 2011), the defendant had
purchased the plaintiff's trademarked names through the Google AdWords program.  The Court
concluded that "there is no dispute that defendants' use of the [plaintiff's] mark to purchase
AdWords to advertise its products for sale on the Internet constitutes 'use in commerce' under
the Lanham Act."  <u>CJ Products</u>, 809 F. Supp. 2d at 158 (citing <u>Rescuecom</u>, 562 F.3d at 127).
Similarly, in <u>Allied Interstate LLC v. Kimmel & Silverman P.C.</u>, 2013 WL 4245987 (S.D.N.Y.
Aug. 12, 2013), the court in denying a motion to dismiss a trademark claim found that
"[a]lthough Defendants attempt to draw a distinction between Google's sale of Plaintiff's mark
and their own purchase thereof, it is clear . . . that Defendant is using Plaintiff's trademark in
commerce."  <u>Id.</u> at *3; <u>accord</u> <u>Austl. Gold, Inc. v. Hatfield</u>, 436 F.3d 1228, 1233  (10th Cir.
2006) ("Defendants continued to use the trademarks . . . on the metatags for their Web sites to
attract customers to the Web sites, and to pay [online search engine] for a premium placement if
either trademark was used in a search query."); <u>Playboy Enters., Inc. v. Netscape Commc'ns</u>
<u>Corp.</u>, 354 F.3d 1020, 1025 (9th Cir. 2004) (finding "actionable" trademark use where
"defendants, in conjunction with advertisers, have misappropriated the goodwill of [plaintiff's]
marks by leading Internet users to competitors' websites"); <u>Hearts on Fire Co., LLC v. Blue</u>
<u>Nile, Inc.</u>, 603 F. Supp. 2d 274, 283 (D. Mass. 2009) ("[T]here is little question that the purchase
of a trademarked keyword to trigger sponsored links constitutes a 'use' within the meaning of
the Lanham Act."); <u>see also</u> <u>Network Automation, Inc. v. Advanced Sys. Concepts, Inc.</u>, 638
F.3d 1137, 1145 (9th Cir. 2011) ("We now agree with the Second Circuit that [the purchase of

trademark as a search engine keyword] is a 'use in commerce' under the Lanham Act.") (citing Rescuecom, 562 F.3d at 127).  Defendants have cited several district court cases holding such internal use cannot satisfy the "use" requirement, see Orig. Def. Mem. at 4, but they all precede Rescuecom, and Rescuecom explicitly rejected this line of authority, see 562 F.3d at 129-30. Indeed, although defendants failed to disclose it in their brief, Rescuecom specifically criticized one of the very cases defendants cite: Merck & Co., Inc. v. Mediplan Health Consulting, Inc., 425 F. Supp. 2d 402 (S.D.N.Y. 2003).  See Rescuecom, 562 F.3d at 129-30.  We are aware of no authorities since Rescuecom that support defendants' position.

In sum, this Court is bound by the Rescuecom decision and does not see any distinction between the "use" found there and the "use" alleged in this case.  Accordingly, LBF sufficiently plead the "use in commerce" requirement when it alleged that defendants purchased LBF's trademarks as keywords from Google AdWords and other SEM programs, which led to defendants' advertisements being displayed on the search results pages for LBF's keywords in such a way as to confuse online customers.

### B.    State Common Law and Statutory Claims for Trademark Infringement

LBF has raised claims for "trademark infringement and unfair competition in violation of New York state common law" as well as analogous claims arising under the New York General Business Law.  Compl. ¶ 1.  With regard to these claims, LBF has made the same allegations involving defendants' improper and misleading use of LBF's trademarks through Google AdWords and the other SEM programs.

It is well established that "[t]he elements necessary to prevail on causes of action for trademark infringement and unfair competition under New York common law mirror the Lanham Act claims."  ESPN, Inc. v. Quiksilver, Inc., 586 F. Supp. 2d 219, 230 (S.D.N.Y. 2008);

accord Van Praagh v. Gratton, 993 F. Supp. 2d 293, 301 (E.D.N.Y. 2014) ("Courts employ substantially similar standards when analyzing claims for trademark infringement under the Lanham Act, 15 U.S.C. § 1114(1)(a); false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a); trademark infringement under New York common law; and unfair competition under New York common law."). That is — "[t]o prevail on a statutory or common law claim of trademark infringement, a party must establish that the symbols for which it seeks trademark protection are valid, legally protectable marks and that another's subsequent use of a similar mark is likely to create confusion as to the origin of the product." Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V., 17 F.3d 38, 43 (2d Cir. 1994); accord Audi AG v. Shokan Coachworks, Inc., 592 F. Supp. 2d 246, 270-71 (N.D.N.Y. 2008) (same). Additionally, the plaintiff must "show that the defendant acted in bad faith." See Luv n' Care, Ltd. v. Mayborn USA, Inc., 898 F. Supp. 2d 634, 643 (S.D.N.Y. 2012).

Defendants argue that LBF's state common law and statutory claims should be dismissed because "the Amended Complaint fails to show how LBF was harmed by [defendants'] alleged conduct, which is required for the common law and state statutory claims." Def. Mem. at 8. While defendants' analysis on this point is lacking in citation to authorities, it appears that the crux of their argument is that the complaint does not adequately show consumer confusion. See Def. Reply at 7 ("LBF must recognize that it is on thin ice in relying on anonymous online reviews for its allegations of consumer confusion.").[2]

---

[2] Some of LBF's state statutory claims have elements that are additional to or different from the federal or state common law trademark infringement claims. However, in arguing that LBF's state law claims are improperly pled, defendants do not appear to raise distinct arguments for such claims. Nor is the Court obliged to construe defendant's brief as making such arguments given that defendants were required to set forth their legal arguments "with particularity." See Fed. R. Civ. P. 7(b)(1)(B); E.E.O.C. v. Int'l Ass'n of Bridge, Structural &

"Likelihood of confusion requires that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question, . . . or are likely to believe that the mark's owner sponsored, endorsed, or otherwise approved of the defendant's use of the mark." Merck, 425 F. Supp. at 411 (internal punctuation and citations omitted).  To determine whether there is a likelihood of confusion between two or more marks, courts in this Circuit apply the eight factors set forth in Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492, 495 (2d Cir. 1961): (i) the strength of the plaintiff's trademark; (ii) the degree of similarity between the parties' marks; (iii) the proximity of the products; (iv) the likelihood that the plaintiff will "bridge the gap" between the products; (v) the existence of actual confusion; (vi) the defendant's good faith; (vii) the quality of the defendant's product; and (viii) the sophistication of the consumers.  See, e.g., Star Indus., Inc. v. Bacardi & Co. Ltd., 412 F.3d 373, 384-91 (2d Cir. 2005) (applying Polaroid factors).  Likelihood of confusion is an issue on which the plaintiff bears the burden of proof.  See, e.g., KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 543 U.S. 111, 117-18 (2004).  However, "[t]here is no requirement that a plaintiff address the Polaroid factors in its pleading; such a requirement would be inconsistent with the 'notice pleading' philosophy of the Federal Rules of Civil Procedure." Eliya, Inc. v. Kohl's Dep't Stores, 2006 WL 2645196, at *3 n.2 (S.D.N.Y. Sept. 13, 2006); accord Sussman-Automatic Corp. v. Spa World Corp., 2014 WL 1651953 at *6 (E.D.N.Y. Apr. 25, 2014).  Thus, it has been often stated that "[l]ikelihood of confusion is a fact-intensive analysis that ordinarily does not lend itself to a motion to dismiss." Van Praagh, 993 F. Supp. 2d

---

Ornamental Ironworkers, Local 580, 139 F. Supp. 2d 512, 523 (S.D.N.Y. 2001) ("Rule 7(b)(1) . . . [is] designed to afford the opposing party with a meaningful opportunity to respond and the court with enough information to process the motion correctly.") (internal punctuation and citation omitted).

at 303 (citing cases).  A motion to dismiss will be granted for failure to plead likelihood of confusion only if "no reasonable factfinder could find a likelihood of confusion on any set of facts that plaintiff could prove."  Brown & Brown, Inc. v. Cola, 745 F. Supp. 2d 588, 617 (E.D. Pa. 2010) (internal quotation marks and citation omitted); see also Van Praagh, 993 F. Supp. 2d at 303-04 (finding that "likelihood of confusion" had been sufficiently pled where it was "possible" that the defendant's use of the plaintiff's trademark "may confuse a consumer into think that her services are in some way connected to or endorsed by the [p]laintiff").

Here, LBF alleged sufficient facts to plausibly suggest a likelihood of consumer confusion.  LBF alleges that "[w]hen an Internet user searching on a search engine for LBF's Marks is presented with a search results page which contains multiple sponsored links, one of which may be for [LBF's] websites, and others for Defendants' competing websites . . . [the user] may click on one of the sponsored links for Defendants' websites, believing that it is related to, or sponsored by [LBF]."  Compl. ¶ 73.  In Rescuecom, the Second Circuit recognized that allegations of this sort are sufficient to survive a motion to dismiss.  Specifically, the court stated that the plaintiff had alleged that "would-be purchasers (or explorers) of its services who search for its website on Google are misleadingly directed to the ads and websites of its competitors in a manner which leads them to believe mistakenly that these ads or websites are sponsored by, or affiliated with [the plaintiff]."  Rescuecom, 562 F.3d at 130-31.  The court noted that it did not have to determine whether this "practice is in fact benign or confusing" because it "consider[s] at the 12(b)(6) stage only what is alleged in the Complaint."  Id. at 131. Thus, we conclude that LBF's allegations raise the reasonable inference that Internet users have likely believed LBF "sponsored, endorsed, or otherwise approved of [defendants'] use of the [LBF] mark."  Merck, 425 F. Supp. 2d at 411.  Because we have found such allegations to be

sufficient, there is no need to address defendants' argument that LBF's citation to consumer complaints are by themselves inadequate to show likelihood of confusion.

Accordingly, because LBF has provided sufficient allegations suggesting a likelihood of consumer confusion, defendants' arguments on this point should be rejected.[3]

## C.   State Deceptive Practices Claims

In Counts VI and VII of its amended complaint, LBF alleges that defendants violated New York Gen. Bus. Law §§ 349 and 350 by "willfully using LBF's Marks, trade names," and "close variations" or "key parts" thereof "without [LBF's] consent and advertising misleading sales, promotions and deals to the New York consumer public."  Compl. ¶¶ 152, 157.   LBF alleges that this "unauthorized, wilful use . . . is likely to cause confusion, mistake, or deception as to the source, sponsorship, or approval of Defendants' travel services and falsely and deceptively represent Defendants' travel services as being affiliated with, sponsored by, authorized by, or provided by, [LBF]."  Id. ¶¶ 153, 158.  LBF alleges that these actions "provide an unfair commercial and financial benefit to Defendants, have caused or threaten to cause injury to [LBF's] good will and reputation, and unfairly divert customers and revenue from [LBF]."  Compl. ¶¶ 153, 159.

N.Y. Gen. Bus. Law § 349 contains a general prohibition on "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service."  Similarly, N.Y. Gen. Bus. Law § 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service."  Both of these sections contain

---

[3] Defendants also argue that these claims should be dismissed because, like the federal Lanham Act claims, they do not establish that LBF's marks were "use[d] in commerce."  See Def. Mem. at 3.  We reject this argument for the reasons stated above in Section III.A.

provisions creating private rights of action to recover damages suffered as a result of such conduct.  See N.Y. Gen. Bus. Law §§ 349(h), 350-e(3); Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc., 133 F. Supp. 2d 162, 166 (E.D.N.Y. 2001).

"To successfully assert a claim under General Business Law § 349 (h) or § 350, 'a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice.'"  Koch v. Acker, Merrall & Condit Co., 18 N.Y.3d 940, 941 (2012) (quoting City of N.Y. v. Smokes–Spirits.Com, Inc., 12 N.Y.3d 616, 621 (2009)); accord Orlander v. Staples, Inc., 2014 WL 2933152, at *8 (S.D.N.Y. June 30, 2014).  "Although the statute is, at its core, a consumer protection device . . . corporate competitors now have standing to bring a claim under this statute so long as some harm to the public at large is at issue."  Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256, 264 (2d Cir. 1995) (internal punctuation, brackets, and citations omitted); see In re Houbigant Inc., 914 F. Supp. 964, 983 (S.D.N.Y. 1995) (noting that "courts have held that competitors have standing to challenge deceptive practices under Sections 349 and 350 so long as some harm to the public at large is at issue") (internal quotation marks and citation omitted), clarified on rearg., 914 F. Supp. 997 (S.D.N.Y. 1996).  For a competitor to assert a claim under § 349 or § 350, however, "the gravamen of the complaint must be consumer injury or harm to the public interest."  Securitron, 65 F.3d at 264 (internal quotation marks and citation omitted); see 4 K & D Corp. v. Concierge Auctions, LLC, 2 F. Supp. 3d 525, 548 n.13 (S.D.N.Y. 2014) ("courts routinely reject a competitor's Sections 349 and 350 claims if the gravamen of the complaint is . . . harm to plaintiff's business rather than harm to the public interest in New York at large.") (internal quotation marks and citation omitted); see also Gucci Am., Inc. v. Duty Free Apparel, Ltd., 277 F. Supp. 2d 269, 274 (S.D.N.Y. 2003) ("Where the

19

gravamen of the complaint is harm to a business as opposed to the public at large, the business does not have a cognizable cause of action under § 349."); Something Old, Something New, Inc. v. QVC, Inc., 1999 WL 1125063, at *11 (S.D.N.Y. Dec. 8, 1999) ("In order for a claim brought under either section [349 or 350] to be successful, the gravamen of the complaint must be consumer injury or harm to the public interest.") (internal quotation marks and citation omitted). In other words, a plaintiff "must show that the acts or practices [of the defendants] have a broader impact on consumers at large in that they are directed to consumers or that they potentially affect similarly situated consumers," and "that consumers be harmed by the defendants' alleged conduct." Tasini v. AOL, Inc., 851 F. Supp. 2d 734, 742 (S.D.N.Y. 2012) (internal quotation marks and citation omitted) (dismissing plaintiff's claim brought under § 349 because the complaint "fail[ed] to state facts indicating that the defendants' alleged misleading conduct was consumer-oriented.").

Defendants argue that LBF's allegations "do not indicate any risk to the public's health or safety or any harm to the public interest as required to state a valid claim under § 349 or § 350." Orig. Def. Mem. at 17. "[C]ourts in New York have routinely dismissed trademark claims brought under Sections 349 and 350 as being outside the scope of the statutes, because ordinary trademark disputes do not 'pose a significant risk of harm to the public health or interest' and are therefore not the type of deceptive conduct that the statutes were designed to address." Kaplan, Inc. v. Yun, 2014 WL 1689040, at *9 (S.D.N.Y. Apr. 30, 2014) (quoting DePinto v. Ashley Scott, Inc., 635 N.Y.S.2d 215, 217 (1st Dep't 1995)). In other words, § 349 and § 350 claims cannot be brought in "trademark infringement actions alleging only general consumer confusion" because such allegations do not suffice to establish "direct harm to consumers." Perkins School for the Blind v. Maxi-Aids, Inc., 274 F. Supp. 2d 319, 327

(E.D.N.Y. 2003).  Thus, for a claim to be cognizable under these provisions, there must be some "specific and substantial injury to the public interest over and above the ordinary trademark infringement . . . ."  Nomination Di Antonio E Paolo Gensini S.N.C. v. H.E.R. Accessories Ltd., 2009 WL 4857605, at *8 (S.D.N.Y. Dec. 14, 2009) (emphasis omitted).

To the extent LBF's § 349 and § 350 claims are premised on defendants' use of the SEM programs to "falsely and deceptively represent Defendants' travel services as being affiliated with, sponsored by, authorized by, or provided by, [LBF]," Compl. ¶¶ 153, 158, these claims must fail.  These allegations regarding the SEM programs do not establish any "significant risk of harm to the public health or interest."  H.E.R. Accessories Ltd., 2009 WL 4857605, at *8 (dismissing claims brought under § 349 and § 350 because the "alleged injury — confusion and deception of the consuming public — . . . is not distinct from the very harm that trademark laws generally seek to redress and thus is not over and above ordinary trademark infringement") (internal quotation marks and citation omitted); see also Luv N' Care, 695 F. Supp. 2d at 135-36 (allegations that defendant "conduct[ed] a 'bait and switch,' and mislead[] customers by commissioning misleading 'knock-off' products and 'palming them off' to confused customers" insufficient to state a cause of action under N.Y. Gen. Bus. Law § 349); Gross v. Bare Escentuals Beauty, Inc., 632 F. Supp. 2d 293, 299 (S.D.N.Y. 2008) ("Consumer confusion as to the source of the product does not create a cause of action under [N.Y. Gen. Bus. Law § 349].").

To the extent LBF's § 349 and § 350 claims are premised on defendants' "comparative savings claims for airfares posted to their websites," Compl. ¶ 103, these claims must also fail because LBF has not alleged any facts showing harm to the public.  LBF alleges that the advertised savings "were misleading and grossly exaggerated and/or did not actually offer savings to the consumers."  Id.  These advertised savings were misleading, according to LBF,

21

because the defendants failed to explain the rates that were being used as benchmarks or the source of those benchmarks.  Id. ¶ 104.  LBF's allegations, however, do not show that consumers were actually harmed — as opposed to being unfairly induced to purchase from defendants' websites.  Pointing to its allegation that defendants "announced limited-time price reductions when the rates were available on the [sic] ongoing basis," id. ¶ 103, LBF argues that these claims deceived consumers, see Pl. Mem. at 18.  But once again, these allegations do not reflect that any actual harm was experienced by the consumer.

Finally, LBF alleges that defendants "made other unsupported claims," Compl. ¶ 103, "such as 'CheapOair saves you time and guarantees the best rate,' implying that they offered the best and lowest rates, leaving no reason for consumers to comparison shop for better rates," id. ¶ 107.  But these allegations are simply too vague to allow the conclusion that defendants' "unsupported claims" resulted in actual harm to the public.  That LBF may have lost business as a result of defendants' assertions is not enough to meet the requirements of the statute.  See Kforce, Inc. v. Alden Pers., Inc., 288 F. Supp. 2d 513, 519 (S.D.N.Y. 2003) ("as long as the public receives the product or service, a loss of business by the plaintiff is not considered a public harm"); QVC, Inc., 1999 WL 1125063, at *12 ("[a] deliberate effort by one competitor to destroy the other's business is not considered a harm to the public interest . . . . Even if plaintiffs lost sales to [the defendant], the public still received its [product]."); Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 1992 WL 170559, at *4 (S.D.N.Y. July 2, 1992) (where "the gravamen of [plaintiff's] . . . claim is harm to a store, not harm to its customers, nor harm to the public at large . . . . the alleged harm to the plaintiff's business far outweighs any incidental harm to the public at large.").

Indeed, even if LBF had alleged that it or another competitor actually offered better rates,

"[t]he limited public harm alleged, that . . . consumers paid more for an allegedly inferior product, is incidental in nature and insufficient to support a claim under § 349." Reed Const. Data Inc. v. McGraw-Hill Cos., Inc., 745 F. Supp. 2d 343, 355 (S.D.N.Y. 2010) (where the "only allegation regarding public harm is that consumers in the New York construction data market may have overpaid to subscribe to the Dodge Network when Reed Connect is a superior product . . . . it does not state a claim under New York GBL § 349."); see also Gucci 277 F. Supp. 2d at 275 (finding that defendants' "allegation that consumers will be forced to . . . pay much higher prices to purchase the same items from [a competitor], does not set forth sufficient consumer harm to state a claim under § 349."). The same reasoning applies to a claim under section 350. See, e.g., Greenlight Capital, Inc. v. Greenlight (Switzwerland) S.A., 2005 WL 13682, at *6 n.8 (S.D.N.Y. Jan. 3, 2005) ("The public harm analysis of a N.Y. Gen. Bus. Law § 349 holds true for § 350 claims, which are based on a specific type of deception, [to wit,] false advertising.").

In the end, the allegations regarding comparative savings "focus[] on harm to [LBF's] business interest, not consumer injury or harm to the public interest." Reed Const. Data, 745 F. Supp. 2d at 355. The crux of LBF's claims is that defendants' actions "provide an unfair commercial and financial benefit to Defendants, have caused or threaten to cause injury to Plaintiff's good will and reputation, and unfairly divert customers and revenue from Plaintiff." Compl. ¶¶ 153, 159. Such allegations do not meet the requirements of sections 349 or 350.

Accordingly, counts VI and VII of the complaint should be dismissed.

D.      Trade Dress Infringement Claims

The complaint alleges that defendants are liable for trade dress infringement because their "intentional, imitation of the distinctive look and feel of [LBF's] websites, are likely to cause confusion, mistake, or deception as to the source, sponsorship, or approval of defendants'

travel services."  Id. ¶ 163; see also id. ¶¶ 133-37.

"To establish a claim of trade dress infringement under [the Lanham Act], plaintiff must first demonstrate that its trade dress is either inherently distinctive or that it has acquired distinctiveness through a secondary meaning . . . [and] must [then] demonstrate that there is a likelihood of confusion between defendant's trade dress and plaintiff's."  Fun-Damental Too, Ltd. v. Gemmy Indus. Corp., 111 F.3d 993, 999 (2d Cir. 1997) (emphasis omitted).  "The defendant may avoid liability, however, by proving that the trade dress is not worthy of protection under the trademark law because it is functional."  Laureyssens v. Idea Grp., Inc., 964 F.2d 131, 136 (2d Cir. 1992).

Defendants argue that the complaint does not adequately plead the substantive elements of a trade dress claim.  See Def. Mem. at 3-6.  We need not address any of these contentions, however, because we agree with defendants' alternative argument that the website trade dress infringement claims must be dismissed because they were required to be brought as counterclaims in a prior action.  See id. at 6.

Before the instant case was filed, Fareportal and WK Travel filed a complaint against LBF in the United States District Court for the Southern District of New York in which they asserted claims for trademark infringement, trade dress infringement, and unfair competition. See Complaint, filed Apr. 11, 2013 (Docket # 1 in 13 Civ. 2412) ("Def. Compl.").  Some of the claims by Fareportal and WK Travel mirror the claims asserted by LBF here.  For example, Fareportal and WK Travel allege that LBF purchased keywords of its competitors' trademarks, including Cheapoair and OneTravel, in the Google AdWords program.  See id. ¶ 36. Additionally, they contend that LBF's Smartfares.com website homepage imitates WK Travel's OneTravel.com homepage, see id. ¶¶ 70-75, and that LBF's Travelation.com search screen

24

imitates the search screen of OneTravel.com, see id. ¶¶ 91-95.  On May 13, 2013, LBF filed an

answer in that suit but did not assert any counterclaims against Fareportal and WK Travel.  See

Answer to Complaint, filed May 13, 2013 (Docket # 5 in 13 Civ. 2412).

Under Fed. R. Civ. P. 13(a), "[a] pleading must state as a counterclaim any claim that —

at the time of its service — the pleader has against an opposing party if the claim: (A) arises out

of the transaction or occurrence that is the subject matter of the opposing party's claim; and (B)

does not require adding another party over whom the court cannot acquire jurisdiction."  The

effect of Rule 13(a) is that "[a] counterclaim which is compulsory but is not brought is thereafter

barred."  Baker v. Gold Seal Liquors, Inc., 417 U.S. 467, 469 n.1 (1974); accord Mali v. Fed.

Ins. Co., 720 F.3d 387, 395 (2d Cir. 2013) ("A counterclaim that is not timely pled is

subsequently barred.") (citing Baker, 417 U.S. at 469 n.1).

"Whether a counterclaim is compulsory or permissive turns on whether the counterclaim

arises out of the transaction or occurrence that is the subject matter of the opposing party's

claim, and this Circuit has long considered this standard met when there is a 'logical

relationship' between the counterclaim and the main claim."  Jones v. Ford Motor Credit Co.,

358 F.3d 205, 209 (2d Cir. 2004) (internal quotation marks and citation omitted).  Under this

standard, there need not be "an absolute identity of factual backgrounds"; rather, the logical

relationship test only requires that "the essential facts of the claims [are] so logically connected

that considerations of judicial economy and fairness dictate that all the issues be resolved in one

lawsuit."  Id. (internal quotation marks and citations omitted); accord Critical-Vac Filtration

Corp. v. Minuteman Int'l, Inc., 233 F.3d 697, 699 (2d Cir. 2000).

Defendants assert that LBF's trade dress claims have "logical and factual connections"

with the claims defendants brought against LBF in the prior suit because "[e]stablishing the

dates of first use of each party's trade dress answers the question of who has the trade dress rights in both action[s]."  Def. Mem. at 6.  Defendants also point out that "a substantial amount of the language in [defendants'] original website trade dress infringement claims against LBF . . . reappears in LBF's Amended Complaint . . . thus reinforcing the connections between the two actions."  Id.  Defendants contend that "determining the priority of the websites is the identical issue in the Fareportal Action and this action so the claims must arise from the same aggregate set of operative facts, and logically relate to each other."  Def. Reply at 7.

As defendants have correctly noted, LBF's trade dress infringement claims are not only logically related to defendants' trade dress claims, they are premised on the exact same factual issues.  In their complaint against LBF in the prior action, defendants allege that LBF "mimicked the distinctive 'look and feel' of [defendants'] websites in order to make their own competing services appear connected with [defendants'] services and thereby misappropriate [defendants'] good will and customers."  Def. Compl. ¶ 125.  Additionally, defendants contend that "LBF Travel's . . . conscious imitation and subjective intent to imitate and create a likelihood of consumer confusion is evidenced by the cumulative lack of differentiation between the distinctive, nonfunctional design elements of their competing websites."  Id. ¶ 127.  Specifically, defendants allege that "[t]he layout of the homepage for [LBF's] Smartfares.com is substantially similar to the homepage for Onetravel.com," id. ¶ 73, and that LBF's website "Travelation.com has adopted a search screen that is substantially similar to the one developed and used by OneTravel.com," id. ¶ 94.

In its complaint in this case, LBF has brought essentially identical trade dress infringement claims against defendants, with the only difference being that LBF has alleged that its websites pre-dated defendants' websites.  Indeed, LBF alleges the same trade dress

similarities described in defendants' prior complaint.  Just as defendants alleged that LBF's Smartfares.com website mimicked the Onetravel.com website, LBF asserts in its complaint here that "[d]efendants blatantly imitated the distinctive graphic and interactive elements of Smartfares.com design . . . [on] [t]he homepage for Onetravel.com."  Compl. ¶ 91.  Additionally, defendants' claim in the prior suit that "Travelation.com has adopted a search screen that is substantially similar to the one developed and used by OneTravel.com," Def. Compl. ¶ 94, is mirrored by LBF's claim that "Onetravel.com has adopted a search screen that has substantially similar look and feel to the one developed and used by Travelation.com," Compl. ¶ 93.  Thus, defendants' and LBF's trade dress claims are premised on the same set of facts.

In response to defendants' argument on this point, LBF asserts without support or even explanation that its "claims against [defendants] . . . arise from an entirely different set of transactions" and that "the underlying conduct is not the same."  Pl. Mem. at 12.  LBF never elucidates, however, how the factual predicates of the two claims are different, other than the irrelevant assertion that two different parties are being accused of trade dress infringement.  See id. ("[In the earlier action,] LBF is the purported infringer with respect to Fareportal's trademarks and trade dress; in this action, it is Fareportal who is accused of infringing on LBF's trademarks and trade dress.").  LBF spends most of its argument on this point discussing the case of Mattel, Inc v. MGA Entertainment, Inc., 705 F.3d 1108 (9th Cir. 2013), which involved competing claims of misappropriation of trade secrets.  Mattel, however, provides no guidance here.  In Mattel, the plaintiff alleged that its former employees had disclosed its trade secrets directly to the defendant.  705 F.3d at 1110.  The defendant, by contrast, alleged that the plaintiff's employees stole the defendant's trade secrets "by engaging in chicanery (such as masquerading as buyers) at toy fairs."  Id.  Mattel unremarkably held that the two sets of claims

27

did not have the necessary "logical relationship" because the trade secret claims involved a different "aggregate core of facts." Id. In our case, by contrast, LBF and defendants' claims for trade dress infringement are premised on the exact same facts.

In sum, because LBF's trade dress claims share a "logical relationship" with defendants' trade dress claims and indeed arise out of the same set of facts, Fed. R. Civ. P. 13(a) required LBF to assert them as compulsory counterclaims in defendants' prior suit. Accordingly, these claims premised on defendants' alleged trade dress infringement should be dismissed.[4]

> E.      Declaratory Judgment Claims

Defendants argue that LBF's claims for "declaratory judgment of invalidity and cancellation under 15 U.S.C. § 1064 of defendants' trademark[s]," see Compl. ¶¶ 171-94, should be dismissed because "the claims are properly raised, if at all, as compulsory counterclaims in [defendants'] prior action," Def. Mem. at 12-13. Defendants assert that courts applying the logical relationship test "in the context of intellectual property litigation have confirmed that such a 'logical relationship' exists between infringement claims and invalidity claims." Def. Prior Mem. at 20. Additionally, defendants argue that the logical relatedness of the claims is demonstrated by the fact that LBF asserted trademark invalidity as an affirmative defense in the prior suit, see id. at 21, and note that LBF repeatedly mentions in its amended complaint that "[d]efendants' initiation of the [prior suit] created a case of actual controversy within the meaning of 28 U.S.C. §2201 et seq. thus warranting the declaratory relief sought by Plaintiff in this matter," see Compl. ¶¶ 172, 178.

---

[4] Obviously, nothing herein should be construed as opining as to the merits of any motion LBF may make to amend its answer in the other lawsuit to include a counterclaim for trade dress infringement.

LBF has not responded to these arguments.  Instead, it has simply stated, "[t]o the extent this Court believes that the cancellation claims are logically connected to the Fareportal Action and as such must be brought as compulsory counterclaims, LBF respectfully requests the Court's clarification of same and will proceed accordingly."  Pl. Mem. at 19-20.  Additionally, LBF has noted "that the Fareportal Action is still pending, and [that] LBF retains the right to make a motion for leave to amend their Answer to assert counterclaims [in that action]."  Id. at 19.

Accordingly, because LBF has not disputed defendants' arguments on this issue, we deem its claims on this point to be abandoned and find that LBF's declaratory judgment claims should be dismissed.  See Frontline Processing Corp. v. Merrick Bank Corp., 2014 WL 837050, at *11 (S.D.N.Y. Mar. 3, 2014) ("[Plaintiff] did not respond to [defendant's] arguments in support of its motion to dismiss the deceit claims, and therefore this Court deems the deceit claim abandoned.") (citing Jessamy v. City of New Rochelle, 292 F. Supp. 2d 498, 504 (S.D.N.Y. 2003)); accord McNeil-PPC, Inc. v. Perrigo Co., 2007 WL 81918, at *12 n.4 (S.D.N.Y. Jan. 12, 2007) ("[Defendant] ignores Plaintiffs' contention and, therefore, the argument is deemed conceded."); see generally Jackson v. Fed. Express, Inc., 766 F.3d 189, 194 (2d Cir. 2014) (plaintiff who opposes only part of defendant's summary judgment motion may be deemed to have abandoned the unopposed claims).

IV.    CONCLUSION

For these reasons, defendants' motion to dismiss the first amended complaint (Docket # 13) should be granted in part and denied in part.  Specifically, LBF's claims for trade dress infringement, declaratory judgment, deceptive practices under N.Y. Gen. Bus. Law § 349, and false advertising under N.Y. Gen. Bus. Law § 350 should be dismissed.

## PROCEDURE FOR FILING OBJECTIONS TO THIS
## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties have fourteen (14) days including weekends and holidays from service of

this Report and Recommendation to serve and file any objections. See also Fed. R. Civ. P. 6(a),

(b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the

Court, with copies sent to the Hon. Lewis A. Kaplan at 500 Pearl Street, New York, New York

10007. Any request for an extension of time to file objections must be directed to Judge Kaplan.

If a party fails to file timely objections, that party will not be permitted to raise any objections to

this Report and Recommendation on appeal. See Thomas v. Arn, 474 U.S. 140 (1985); Wagner

& Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84,

92 (2d Cir. 2010).

Dated: November 5, 2014
       New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

30